# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1731 | **DATE** | 3/31/2003 |
| **CASE TITLE** | Hawkins, et al. vs. Groot Industries, Inc., et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1)  ☐  Filed motion of [ use listing in "Motion" box above.]

(2)  ☐  Brief in support of motion due _____.

(3)  ☐  Answer brief to motion due_____. Reply to answer brief due_____.

(4)  ☐  Ruling/Hearing on _____ set for _____ at _____.

(5)  ☐  Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6)  ☐  Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7)  ☐  Trial[set for/re-set for] on _____ at _____.

(8)  ☐  [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9)  ☐  This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
        ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■   [Other docket entry]   ENTER MEMORANDUM OPINION AND ORDER: Defendants' motion for summary judgment against plaintiff Anderson Hawkins [26-1] is granted in part and denied in part, as is defendants' motion for summary judgment against plaintiff Larry Woodfork [24-1].

(11) ■   [For further detail see order attached to the original minute order.]

| | |
|---|---|
| No notices required, advised in open court. | |
| No notices required. | |
| Notices mailed by judge's staff. | |
| Notified counsel by telephone. | |
| Docketing to mail notices. | |
| Mail AO 450 form. | |
| Copy to judge/magistrate judge. | |

number of notices

MAR 31 2003
date docketed

docketing deputy initials

date mailed notice

DJ/sea  courtroom deputy's initials

U.S. DISTRICT COURT
CLERK
03 MAR 31 PM 2: 55
FILED ED 10
Date/time received in central Clerk's Office

Document Number

119

mailing deputy initials

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ANDERSON HAWKINS, LAWRENCE WOODFORK, ENRIQUE HERNANDEZ, and JAVIER GUERRERO, on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 01 C 1731<br>Judge Joan B. Gottschall<br>Magistrate Martin C. Ashman |
| v. | ) ) | |
| GROOT INDUSTRIES, INC. and GROOT RECYCLING AND WASTE SERVICES, INC., | ) ) ) ) | |
| Defendants. | ) ) | |

DOCKETED
MAR 3 1 2003

## MEMORANDUM OPINION & ORDER

Plaintiffs Anderson Hawkins and Larry Woodfork have sued their former

employer(s), Groot Industries, Inc. and Groot Recycling and Waste Services, Inc.

(collectively "Groot"), for various violations of Title VII of the Civil Rights Act of 1964,

as amended, 42 U.S.C. §§ 2000e, *et seq.*, and 42 U.S.C. § 1981.[1]  In the first amended

complaint, Hawkins and Woodfork, who are black men, specifically raise individual

claims that (1) they were subjected to racial harassment and inferior terms and

conditions at Groot; (2) they were subjected to racial discrimination with respect to

discipline (and ultimately discharge) as well as  promotions, work assignments,

---

[1]Enrique Hernandez and Javier Guerrero are also plaintiffs in the action, with claims against Groot for violations of Section 1981; their claims are the subject of Groot's other two pending motions for summary judgment.  Plaintiffs' motion for class certification, filed several months after Groot moved for summary judgment against Hawkins and Woodfork, is also pending.

119

compensation, transfers, and other terms and conditions of employment; and (3) they were disciplined, harassed, and ultimately terminated in retaliation for opposing discrimination. In separate motions, Groot moved for summary judgment against Hawkins and Woodfork.[2] For the reasons explained below, Groot's motion for summary judgment against Hawkins is granted in part and denied in part, as is its motion for summary judgment against Woodfork.

<u>Analysis</u>

The standard for summary judgment is well-known. Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether the movant is entitled to summary judgment, the court examines the admissible evidence in the light most favorable to the nonmoving party, drawing any reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To avoid summary judgment, the party bearing the burden of proof on an issue must affirmatively show the existence of a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S.

---

[2]Groot's motions break down Hawkins and Woodfork's claims very discretely: (1) racial discrimination, (2) termination, (3) discrimination in pay, (4) discrimination in promotion or transfer, (5) discrimination in truck and route assignments; (6) refusal to assign to light duty; (7) retaliatory discharge; and (8) hostile work environment. Hawkins and Woodfork each responded by defending their claims for: (a) hostile work environment; (b) termination; (c) retaliation; and (d) unequal compensation (Hawkins only). The court will address the claims under the plaintiffs' broader characterization.

317, 322-23 (1986). But the nonmovant's own deposition or affidavit may provide sufficient affirmative evidence to survive summary judgment. *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994). "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. *Anderson*, 477 U.S. at 248. Significantly, however, courts apply the summary judgment standard "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Courtney*, 42 F.3d at 418 (internal quotation marks and citations omitted). Indeed, the Seventh Circuit has stated "that a grant of summary judgment which turns on the issue of discriminatory intent should be approached with 'special caution.'" *Id.* at 423 (citations omitted).

With this standard in mind, the court examines Groot's motions for summary judgment against Hawkins and Woodfork.[3]

---

[3]The parties' briefing of these motions made the court's job particularly onerous. For example, the response briefs submitted on behalf of Hawkins and Woodfork (which are nearly identical) were virtually devoid of citations to the record, and devoted less than three pages out of nineteen to legal argument. Similarly, contrary to the local rules and this court's standing order governing motions for summary judgment, plaintiffs' statement of additional material facts precluding summary judgment were not set forth in "**short** numbered paragraphs, generally limited to one fact per paragraph." *See* Standing Order Regarding Mot. Summ. J., Oct. 14, 1999 (Gottschall, J.). Further, rather than simply responding to the opponent's statement of facts with a straightforward "undisputed" or "disputed" with supporting citation(s), both the plaintiffs and defendants frequently found it necessary to insert improper legal argument into their responses or to respond "undisputed," yet add a litany of other facts to consider, which amounts to legal argument. Legal argument belongs in the briefs, not the statements of facts.

## I.   Hostile Work Environment Claim

Hawkins and Woodfork both contend they were subjected to a racially hostile work environment at Groot created by their co-workers and supervisors.[4] To succeed on a hostile work environment claim, a plaintiff "must show that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race, (3) the harassment was severe [or] pervasive so as to alter the conditions of the employee's environment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000). Groot argues for summary judgment on the grounds that neither Hawkins nor Woodfork were exposed to actionable harassment at Groot and even if they were, Groot is not legally responsible for such harassment. The court addresses each of these arguments in turn.

### A.   Actionable Harassment

#### 1.   Hawkins

Regarding Hawkins, Groot's chief argument is that Hawkins was able to testify only regarding a few specific harassing comments, and those few comments are insufficient to sustain a hostile work environment claim. The court disagrees.

---

[4]Although the plaintiffs contend that black and Hispanic drivers were subjected to a racially hostile work environment at Groot created by their co-workers and supervisors, only Hawkins' and Woodfork's respective individual hostile work environment claims are currently at issue.

Hawkins testified that his co-workers Bob Lewkowicz and Chris Lewkowicz, who are white, made racially derogatory comments every day in the drivers' room at Groot where the drivers were gathered before leaving on their routes. They repeatedly called Hawkins and other blacks "nigger," "monkey," "porch monkey," "f----g monkey," "chango" (a Spanish word for monkey), "Kobe Bryant," and "Buckwheat." Hawkins further testified these derogatory comments were made in the presence of Groot supervisors. Additionally, Hawkins testified that white supervisors contributed to the racially hostile work environment. According to Hawkins, supervisor Jim Dowling told him to watch his tan because he was getting darker, supervisor Tom Mayer called him "boy," and supervisor Craig Phillips said "Oh, I like that" when Bob Lewkowicz pretended to slap Hawkins.

Groot asserts that "Hawkins was unable to testify . . . that either of the Lewkowiczes ever made any specific comment on any specific day in the presence of any other particular persons, including supervisors." (Defs.' Mem. Supp. Summ. J. re Hawkins at 10.) This argument falters. Hawkins testified that he was subjected to racial epithets on a *daily* basis. Where a hostile work environment claim involves ongoing conduct, a plaintiff "need not date stamp every incident." *Ferguson v. Chicago Housing Auth.*, 155 F. Supp. 2d 913, 916-17 (N.D. Ill. 2001) (citing *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1457 (7th Cir. 1994)). While Hawkins' case undoubtedly would be stronger if he could provide more detail, his recollection as it stands raises a disputed issue of

material fact regarding the level of racial hostility in the work environment at Groot. Weighing evidence and evaluating the credibility of witnesses are issues for the trier of fact. *Anderson*, 477 U.S. at 255.

Groot also argues that the alleged comments made by the supervisors are not objectively racially offensive. Calling an adult black man "boy" strikes the court as an objectively, inherently offensive comment. A reasonable jury certainly could agree. Indeed, it is disconcerting that Groot suggests otherwise. Further, Hawkins' hostile work environment claim (regarding the conduct of both supervisors and co-workers) is buttressed by evidence from other drivers regarding the racial hostility of the work environment at Groot.[5] For example, plaintiffs offer the affidavits of Anthony Alexandria and Joseph Esposito, two white drivers formerly employed by Groot.[6] Alexandria attested that he heard Groot's white management employees, including Dowling, Phillips and C.J. Sturwold, call black employees "nigger" and "monkey." He further averred that Sturwold once said to him , "Anthony, we need to stick together because these black people can't do what we do." Likewise, Esposito attested that he

---

[5]For purposes of ruling on the motions for summary judgment, only admissible evidence is considered. Not all of the evidence offered by Hawkins and Woodfork is admissible. For example, the documents purporting to be the EEOC's notes from interviews of various Groot employees are unauthenticated, and thus have not been considered.

[6]Groot argues that such affidavits cannot be considered because the affiants failed to appear for their depositions. While Groot's frustration is understandable, its objection cannot be sustained. Groot will have the opportunity to cross-examine these witnesses at trial (assuming they appear).

heard other Groot employees routinely call black employees "monkeys" while members of Groot's management were present.

Although Groot argues to the contrary, such evidence is likely admissible as long as Hawkins was aware of those drivers' experiences while he was employed at Groot.[7] True, Hawkins must produce admissible evidence that he personally was subjected to discrimination. But in evaluating his hostile work environment claim, "the trier of fact must examine the totality of the circumstances, including evidence of harassment directed at employees other than the plaintiff."[8] *Lewis v. Triborough Bridge & Tunnel Auth.*, No. 97 Civ. 0607, 2000 WL 423517, at *5 (S.D.N.Y. Apr. 19, 2000) (citing *Schwapp v. Town of Avon*, 118 F.3d 106, 111-12 (2d Cir. 1997)); *Smith v. Northeastern Ill. Univ.*, No. 98 C 3555, 2002 WL 377725, at *5 (N.D. Ill. Feb. 28, 2002). And although Groot fervently disputes the truth of those affidavits and other evidence, (*see, e.g.,* Defs.' Resp. Pls.' Rule 56.1(b)(3)(B) Statement ("Defs.' Resp. Pls.' SDF") at ¶¶ 18-19), and argues that the

---

[7]There is no evidence before the court that Hawkins learned of others' experiences of harassment after Groot terminated him. Accordingly, construing the evidence in the light most favorable to Hawkins, the court assumes that he had knowledge of their experiences while he was at Groot.

[8]Groot's reliance on *Cooper v. Federal Reserve Bank*, 467 U.S. 867, 875 (1984) and *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 355-56 (5th Cir. 2001) is misplaced. The excerpts from those opinions quoted by Groot were not addressing hostile work environment claims. To be absolutely clear, however, this order does not address whether plaintiffs will be able to establish that Groot engaged in a pattern or practice of discrimination. A determination regarding pattern and practice is distinct from a determination that the experiences of other employees, which plaintiffs knew about, are likely to be relevant and admissible with respect to plaintiffs' individual hostile work environment claims.

testimony of various witnesses is contradictory, Groot's position simply reinforces the court's conclusion that a jury must evaluate the strength and weight of the evidence regarding this claim.

### 2. Woodfork

Groot raises the same arguments for summary judgment against Woodfork as it did against Hawkins: that his testimony was not specific or detailed enough to support a hostile work environment claim. For the reasons explained above, Woodfork also raises a genuine issue of material fact regarding the level of racial hostility he experienced at Groot.

Woodfork, like Hawkins, testified that the Lewkowiczes called him racially derogatory names on a daily basis, including "nigger," "f-----g nigger," "monkey," "f-----g monkey," "dumb nigger," "dumb monkey," and "chango." And like Hawkins, Woodfork testified that these racial slurs were made in the drivers' room where the drivers were assembled prior to leaving on their routes in the presence of Groot supervisors. Moreover, Woodfork's claim, like Hawkins, is bolstered by the experiences of other drivers.[9]

Further, Woodfork's testimony expressly implicated both supervisors and co-workers. For example, Woodfork testified that in or around the spring of 1999, in response to comments he made about slavery, white supervisor Sturwold said, "Hey

_____

[9] As with Hawkins, there is no evidence before the court that Woodfork was unaware of the other drivers' experiences, so the court draws the reasonable inference that Woodfork had knowledge.

that was the good old days, huh?" (Woodfork Dep. at 117:17-22; Woodfork's Resp. Defs.' Statement Undisputed Facts ("SUF") at ¶ 149.) A few minutes later, Sturwold said "something to the effect that 'Well, it's good it's not like that now and . . . there's no bias or no racism now and you don't have to worry about that now.' And he just sort of smiled and walked out, got in his truck, and left." (Woodfork Dep. at 119:6-14.) Earlier, in December 1998, white supervisor Phillips told Woodfork "that he could fire [Woodfork] for any reason. He could fire [Woodfork] if he didn't like the color of [Woodfork's] eyes." According to Woodfork, "Phillips raised his gaze from Woodfork's hands, to his chest, and then to his eyes while he made the comment." (Woodfork's Resp. Defs.' SUF at ¶ 147A.) Groot, offering a racially-neutral explanation for Phillips' comment, claims that Phillips' gazing at Woodfork's skin does not give the comment an objectively racially offensive meaning. That is an argument Groot must save for the jury, together with its argument about the impact and meaning of Sturwold's comments.[10]

## B. Employer Liability

Groot also argues for summary judgment contending that even if Hawkins or Woodfork were subjected to a hostile work environment, Groot is not legally responsible for such harassment. That may turn out to be the case, but Groot has not yet met its burden. "[An] employer is liable for a hostile work environment created by

---

[10]Characterizing Sturwold's "good old days" comment as *ambiguous*, Groot argues that any possible racist meaning "was erased by the *clear* meaning of his alleged comment that 'it's good it's not like that now.'" (Defs.' Mem. Supp. Mot. Summ. J. re Woodfork at 11) (emphasis added). But what Groot deems ambiguous might be quite clear to a jury, and vice versa.

the employee's coworkers . . . when the employee shows that his employer has 'been negligent either in discovering or remedying the harassment.'" *Mason*, 233 F.3d at 1043 (citations omitted). But an "employer is essentially strictly liable if the employee's supervisor created the hostile work environment." *Id.* An employer may avoid liability for a supervisor's conduct, however, if it can establish what is known as the *Faragher-Ellerth* affirmative defense. In other words, provided that no tangible employment action resulted from the supervisor(s)' harassment, Groot can avoid liability for racial harassment by its supervisors by proving: "(a) that the employer exercised reasonable care to prevent and correct promptly [the] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Mason*, 233 F.3d at 1043 n.4 (internal quotation marks and citations omitted).

Regarding liability for the harassment by plaintiffs' co-workers, Groot is liable if it knew or should have known of the harassment, but failed to make efforts to stop it. *Hostetler v. Quality Dining, Inc.*, 218 F. 3d 798, 811 (7th Cir. 2000). Although Groot argues that there is no admissible evidence that Groot supervisors ever heard the racial slurs made by the Lewkowiczes or other drivers, a jury could find otherwise. Both Hawkins and Woodfork testified that the racially derogatory comments were made in the drivers' room when supervisors were present. Although their testimony lacked details about specific occasions, that is an issue for a jury to handle. Besides, Woodfork testified that even when the supervisors were in the office adjacent to the drivers' room,

they were only separated by a Plexiglas window. According to Woodfork, supervisors

must have been able to hear the daily barrage of racial slurs even in the office:

> You got to take into consideration the way Chris [Lewkowicz] says it, okay? Chris is not saying 'you monkey' or you 'f----g monkey.' Chris is yelling it out on the top of his lungs, 'f----g monkey, f----g Chango.' Chris doesn't say anything quietly, he yells it at the top of his lungs. Everyone can hear what Chris says. You can hear it in the office, you can hear it in the break room. If you're coming up the stairs and the door is open, you can hear it coming out the door. He yelled it. Him and his brother. They never said it, they yelled it.

(Woodfork Dep. 54:20–55:8.) Other drivers also testified that supervisors were present

when the harassment took place.[11] And if the jury believes that supervisors not only

knew about, but were contributing to, the hostile work environment, Groot's argument

that it did not know, and could not have known, about the racial harassment of

plaintiffs by their co-workers may be further weakened. The jury will have to weigh

the evidence and make credibility determinations.

As for liability for alleged racial harassment by its supervisors, Groot argues that

the undisputed facts show it has established the *Faragher-Ellerth* affirmative defense.[12]

As stated above, to satisfy the first element of this affirmative defense, Groot must show

---

[11]Arguing that no reasonable jury could believe that racial comments were made in front of supervisors, Groot states that plaintiff Javier Guerrero testified that he never heard racial slurs while supervisors were present. Again, Groot's point highlights the need for a jury to hear the evidence. This court cannot weigh Guerrero's testimony against Hawkins' and Woodfork's and decide who is credible and who is not.

[12]Neither Woodfork nor Hawkins argued that the *Faragher-Ellerth* defense is inapplicable, so the court assumes for present purposes that the harassment did not result in a tangible job action against either Hawkins or Woodfork.

11

that it exercised reasonable care to prevent and correct racial harassment. Employers who are able to establish this element frequently do so by proving that they had an express anti-harassment policy setting forth clear reporting procedures, and that they disseminated the policy to their employees. *See, e.g., Shaw v. Autozone, Inc.*, 180 F.3d 806, 811-12 (7th Cir. 1999) ("[E]xistence of an appropriate anti-harassment policy will often satisfy this first prong.").

Attempting to do just that, Groot points out that its collective bargaining agreement with the drivers' union has an explicit non-discrimination policy. This is true, but all the provision says is that Groot and the Union agree not to unlawfully discriminate. Such a broad, general provision does not constitute a racial harassment policy. It neither explains racial harassment, nor offers employees any guidance regarding what they should do if they believe they have been subjected to racial harassment. *Compare Molnar v. Booth*, 229 F.3d 593, 601 (7th Cir. 2000) (general policy barring discrimination is not a sexual harassment policy, and is insufficient to establish first prong of defense) with *Shaw*, 180 F.3d at 811-12 (defendant satisfied first prong by adopting explicit antiharassment policy with specific, detailed reporting procedures, distributing it to each employee, and conducting training sessions on harassment).

Groot also notes that on June 29, 1998, it adopted a policy against sexual harassment, and shortly thereafter adopted a policy against discrimination. Despite Groot's argument to the contrary, however, it is disputed whether Groot made employees aware of these policies. Groot's assistant controller Georgine Wendell

12

testified that both policies were posted in the drivers' room. But Hawkins testified that he was never given a copy of a policy regarding racial discrimination, and that no such policy was posted in the drivers' room (although he had seen the policy against sexual harassment posted there). Likewise, Woodfork testified that he had never seen the policy regarding racial discrimination, management never informed him that there was such a policy, and management never discussed reporting procedures for racial (or sexual) harassment with employees. This issue is both disputed and material, and therefore must be decided by the jury.[13]

Whether Groot will be able to satisfy the second prong of the *Faragher-Ellerth* affirmative defense, *i.e.*, that the plaintiffs unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid harm , will depend in part on whether Groot is able to satisfy the first prong. Given that Groot has not yet successfully established the first prong, the court need not address Groot's arguments regarding the second.

Groot's motion for summary judgment against Hawkins regarding his hostile

---

[13]Groot also points to the grievance procedure in the collective bargaining agreement. But the grievance procedure was not explicitly created for handling discrimination complaints. It says nothing about racial harassment. Moreover, it sets forth a different reporting procedure than Groot's written policies against sexual harassment or discrimination. Indeed, if employees turned to the grievance procedure for instruction, they would believe that failure to raise complaints of racial harassment in writing with Groot within five days of experiencing such harassment would constitute a waiver of any claims. Groot certainly can raise the grievance procedure at trial, and plaintiffs' awareness of it, but the court will not grant summary judgment based on its existence.

work environment claim is denied, as is Groot's motion for summary judgment against Woodfork regarding his hostile work environment claim.

## II. Discriminatory Discharge

Groot also seeks summary judgment against both Hawkins and Woodfork on their claims for discriminatory discharge. Normally to survive summary judgment on a discriminatory discharge claim, a plaintiff must show[14] that (1) he belongs to a protected class; (2) he performed his job in accordance with his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001). "Establishing a prima facie case creates a presumption of discrimination and shifts the burden to the employer to produce evidence of a legitimate, race-neutral reason for the adverse action." *Id.* If that burden of production is met, "the plaintiff then has the burden to show that the stated nondiscriminatory reason is pretextual." *Id.*

Neither the first nor the third elements are in dispute for either plaintiff. As for the second element, both Hawkins and Woodfork contend that they were singled out for discipline, and ultimately termination, because of their race. Under such circumstances, "it makes little sense . . . to discuss whether [they] were meeting [their]

_____

[14]Importantly, at this stage of the proceedings plaintiffs need not actually prove (or "show") anything. They face only "the substantially less demanding Rule 56 task of demonstrating the existence of a genuine issue of material fact to stave off summary judgment." *Farrow v. Humana Health Plan, Inc.*, 69 F. Supp. 2d 1050, 1058 n.10 (N.D. Ill. 1999).

employer's reasonable expectations." *Id.* (internal quotation marks and citation omitted). Accordingly, despite Groot's argument to the contrary, neither Hawkins nor Woodfork must show that he was meeting Groot's legitimate employment expectations to establish a prima facie case. *Id.* The initial inquiry, therefore, is whether each plaintiff has shown that he was treated less favorably than a similarly situated Groot employee who is not a member of plaintiff's protected class.

Before making that inquiry, however, an explanation of Groot's progressive-discipline policy is necessary. At all relevant times, Groot had written work rules applicable to its drivers that addressed areas such as attendance and safety issues. The relevant work rules regarding attendance stated:

> (1) "Failure to notify the company not less than one hour before your regular show-up time when not reporting for work will result in a warning notice." (Work Rule 1, Woodfork's Resp. Defs.' SUF at ¶61.[15])
>
> (2) "If you are off for any reason and you will be unable to report for work the following day you must notify the company by 2PM so that arrangements can be made to cover your absence." (Work Rule 1, *id.* at ¶ 62.)
>
> (3) "Late—no call before starting time will result in a warning notice." (Work Rule 2, *id.* at ¶ 64.)
>
> (4) "More than <u>one</u> late, <u>with</u> call, in a one month period will result in a warning notice." (Work Rule 3, *id.* at ¶ 65.)
>
> (5) "Are habitually absent from work irregardless[16] . . . of the reasons." (Work Rule 4, *id.* at ¶ 66.)

---

[15]Hawkins also admitted the language of these work rules in his response to defendants' statement of undisputed facts.

[16]Although not generally accepted, "irregardless" is a word. *Merriam-Webster's Collegiate Dictionary* 619 (10th ed. 1999).

(6) "[A] 4th warning letter within a 12 month period will result in a 3 day suspension." (*Id.* at ¶ 68.)

(7) "[A] 5th warning letter in a 12 month period will result in the termination of [the driver's] employment." (*Id.* at ¶ 69.)

The attendance-and-absence reporting rules applied to mandatory safety meetings in addition to drivers' usual start times. Additionally, under the safety rules, drivers had to wear hard-soled, high-top work shoes. Athletic shoes or other soft-soled shoes were expressly prohibited. The safety rules explicitly stated that any employee who failed to wear proper shoes "shall be sent home <u>without</u> compensation . . . ." (*Id.* at ¶ 74.) A plain reading of the work rules reveals that the rule about the fifth warning letter resulting in termination referred only to warning letters based on failure to comply with the attendance-and-absence reporting rules.

Those are the relevant written rules. How Groot implemented them in practice is one of the central issues in this case. It is undisputed that Groot did not strictly follow the written rules. For example, when confronted with the record of an employee who was not terminated after receiving five warning letters, Dowling answered: "Well, it's obvious we don't enforce the fifth warning letter . . . ." (Dowling Dep. at 103:9-11.) He further testified that the "real" number of warnings that would result in termination was probably more like seven or eight. Both Hawkins and Woodfork contend that in practice, Groot enforced the work rules more harshly against its black employees than against its white employees.

That contention brings the court back to the issue of whether Hawkins or Woodfork can show that a similarly situated white employee was treated more favorably under Groot's progressive-discipline policy than they were. Regarding Hawkins' claim, Groot fired Hawkins on May 5, 1999 for cumulative violations of the attendance-and-absence reporting rules. Hawkins was supposed to report for work by 6:00 a.m. that day, but he called supervisor Dowling at 6:28 a.m. to report that his car had broken down. In response, Dowling informed him that he was terminated, effective immediately. That same day, supervisor Mayer wrote a termination letter to Hawkins, which, according to the May 5th letter, was Hawkins' sixth warning letter in a twelve month period. In actuality, it was at least Hawkins' eighth warning letter in the past year.[17] The explanations for those warning letters included being late with no call, being late for a mandatory safety meeting (presumably with no call), missing another mandatory safety meeting, being a no-call/no-show for work on two occasions, and being absent then failing to call by 2:00 p.m. to report his status for the next work day.[18]

---

[17]Warning letters to Hawkins were dated: 5.23.98, 6.2.98, 11.12.98, 1.19.99, 4.8.99, 4.9.99, 4.16.99 and 5.5.99. There was another letter dated 5.19.98. That letter seems to overlap to some extent with the 5.23.98 letter, and neither party argues there were nine letters in a twelve month period.

[18]The warning letters to Hawkins dated June 2, 1998 and January 19, 1999 each state that Hawkins was being suspended for certain rule infractions. Hawkins submitted an affidavit and testified that he was never suspended while employed by Groot. That sworn testimony bars the argument raised in his response brief that he was suspended for rule infractions for which white employees received no suspension.

Hawkins gives examples of at least eight white employees whom he believes were similarly situated and received more favorable treatment than he did: David Prowicz, Tom Sturm, Todd Lazansky, Carmen Murillo, John Humphreys, Tom Finnegan, Robert Whited and Randy Slagle. "[A]n employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). In disciplinary cases like this one, "a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or their employer's treatment of them." *Id.* at 617 (internal citations omitted).

Under this standard, of those eight employees, only Finnegan, Prowicz and Sturm qualify as potentially similarly-situated. Humphreys had special licensing qualifications that Hawkins lacked. Lazanksy was a mechanic, not a driver, and thus was a member of a different union, was subject to a different collective bargaining agreement and had different supervisors. As for Whited, Sturm and Murillo, their absences were predominantly for medically-related reasons and they (evidently) followed the attendance-and-reporting procedures. Under the work rules, employees who are absent but follow the reporting procedures are not subject to a written warning unless their absences are deemed excessive. In contrast, employees who are late and

fail to call before their start time are supposed to receive a written warning each time, as are employees who simply fail to report to work without calling. Sturm's, Murillo's and Whited's situations are not similar enough to Hawkins' to allow comparison, despite plaintiffs' suggestion to the contrary.

After reviewing the evidence presented regarding Prowicz, Finnegan and Slagle, although it is evident that Hawkins' claim is far from strong, he survives summary judgment. Comparing himself to Slagle does nothing to further his claim because Slagle never exceeded five written warnings in a twelve month period. Prowicz, however, received six written warnings in one twelve month period and was not terminated. Similarly, Finnegan received six attendance-related written warnings in less than twelve months and was not terminated (but he was terminated two weeks later upon receiving a non-attendance related warning letter for driving on the wrong side of the road). Hawkins also correctly points out that Finnegan received just one warning letter when, under a literal application of the work rules, he should have received three. But Hawkins omits the fact that he, too, escaped written warnings that he technically should have received; *e.g.*, he was late without calling on at least two, if not three, occasions,[19] and was not disciplined for any of those infractions.[20]

_____

[19]Hawkins admits he was not disciplined even though he was late without calling on 8.17.98 and 10.19.98. Hawkins also admits he was late on 1.12.99 and was not disciplined, but the record fails to indicate whether or not he called. (Hawkins' Resp. to Defs.' SUF at ¶¶ 120, 123, 128.)

[20]Hawkins points to another incident, in which he arrived at work a few minutes late, without calling ahead, and was disciplined whereas his white co-worker, Meyers,

Groot argues that Hawkins clearly received more favorable treatment than Prowicz or Finnegan because he was not terminated until he accumulated eight written warnings. Although it is now known that the termination letter was at least Hawkins' eighth warning letter in a twelve month period, Groot's understanding *on May 5th* was that Hawkins' termination letter constituted his sixth written warning—and that strikes the court as the critical time of inquiry.

Did Prowicz and/or Finnegan, who were not terminated when they received their sixth warning letters, receive more favorable treatment from Groot than Hawkins, who was terminated? Or was Groot's implementation of its progressive-discipline policy riddled with inconsistencies that had nothing to do with race? Those are close questions which the court cannot resolve through summary judgment. Hawkins presents a triable issue of material fact regarding whether he received less favorable treatment than similarly situated white employees. Groot undoubtedly will argue that it had a legitimate, non-discriminatory reason for discharging Hawkins, *i.e.*, his performance, and may well prevail.[21] But not yet. The legitimacy of any reasons Groot

_____

walked in late with Hawkins but was not disciplined. The court cannot consider this incident of alleged discriminatory treatment, however, because Hawkins failed to offer any admissible evidence that Meyers was not disciplined: he submitted only his own hearsay testimony about what Meyers told him. *See Winskunas v. Birnbaum*, 23 F. 3d 1264, 1267-68 (7th Cir. 1994) (substance of evidence submitted in opposition to summary judgment must be admissible).

[21]Groot points out that when Hawkins grieved his termination, arguing that he was discriminated against and harassed, the Labor Management Committee ("Committee") denied his grievance. Relying on *Collins v. New York City Transit Authority*, 305 F.3d 113, 118-19 (2d Cir. 2002), Groot argues that the Committee's

proffered is intertwined with whether Groot enforced its discipline policy more harshly against black employees than white employees, and thus cannot be decided on summary judgment.

Woodfork's claim, however, cannot survive summary judgment. Woodfork was terminated on December 21, 1999; his termination letter stated it was his eleventh warning letter in a twelve month period. He offers the same pool of similarly situated white employees that Hawkins did. As explained above, the only potential similarly situated white employees in that pool are Slagle, Prowicz and Finnegan. None of those three received as many written warnings as Woodfork, which suggests that Woodfork cannot establish a prima facie case of discrimination.

But the answer is not that simple. By the court's count, Woodfork received only ten warning letters in a twelve month period, not eleven.[22] And the letter dated July 6,

_____

decision alone is sufficient to grant summary judgment against Hawkins because Hawkins does not allege that the Committee acted with bias or discrimination. But Groot waited until its reply brief to raise the issue—Hawkins never addressed the issue at all. Further, unlike the *Collins* court, this court has been given no information about what took place before the Committee. Without more information, the court declines to decide the case on this basis.

[22](1) 3.18.99—late for posted safety meeting; (2) 4.9.99—same; (3) 7.6.99—warning after being sent home for not having work boots; (4) 7.7.99—warning for failure to call in by 2:00 p.m. on 7.6.99 (after being sent home for not having work boots) to report his status for 7.7.99; (5) 7.19.99—warning for leaving voice mail rather than speaking with a supervisor when calling to report absence; (6) 7.20.99—warning for calling to report status for next day at 3:15 p.m. rather than by 2:00 p.m.; (7) 9.3.99—late for posted safety meeting; 3 day suspension; (8) 9.7.99—warning for leaving a voice mail on 9.2.99 rather than speaking to supervisor to report absence on 9.3.99; (9) 11.22.99—warning for calling in sick less than an hour before start time; (10) 12.21.99—termination letter for failure to call by 2:00 p.m. on 12.20.99 to report status for following day.

1999 was not attendance-based, but rather was for reporting to work without work boots. That reduces the count to nine.[23] Additionally, the warning letter dated July 7, 1999 appears to have had no basis.[24] Woodfork reported for work on July 6th, but was sent home because he did not have his work boots. He received a warning for that infraction, which he accepts was proper. But then he received another warning letter on July 7th for failing to call in by 2:00 p.m. on the 6th to report that he would be at work the next day. The work rules, on their face, do not require such a call. Rather, work rule 1 states: "If you are off for any reason and you will be *unable* to report for work the following day you must notify the company by 2PM so that arrangements can be made to cover your absence." (Woodfork's Resp. Defs.' SUF at ¶ 62 (emphasis added).) It is undisputed that Woodfork reported to work on July 7th, so he had no obligation to call.[25] Woodfork not only received an unwarranted warning letter, he was sent home again on July 7th for failing to call in his status, so he also lost a day's pay.

Woodfork thus has an argument that he really had only eight attendance-related warning letters. The problem is that even at that level, he offers no one who is similarly

---

[23]Groot repeatedly argues that the court should not consider warnings issued for reasons other than infractions of the attendance-and-absence reporting rules on the grounds that the five-letters-equals-termination rule applies only to attendance-related reporting rules.

[24]Woodfork, however, did not file a grievance to get this warning letter off his record.

[25]For the July 6-7 incidents, the court is relying on the dates on the actual letters, which are the same as the dates in Woodfork's deposition; the dates listed in defendants' SUF, ¶¶ 122, 124-26, are off by a day.

situated. The closest is Finnegan. Woodfork argues that if Finnegan had received a warning letter for each time he was late with no call, rather than one warning letter for three infractions, Finnegan would also have had eight attendance-related infractions. The problem with this argument is that Woodfork also received a couple of breaks during his time at Groot.[26] If the court were to consider the infractions that did not result in warnings for Finnegan, it would have to do so for Woodfork as well.

Woodfork's failure to give an example of a similarly situated white employee who received more favorable treatment under Groot's progressive-discipline policy is fatal to his claim. Without setting forth a prima facie case of discriminatory discharge, he cannot survive summary judgment.

## III.  Unequal Compensation (Hawkins only)

Groot also moves for summary judgment against Hawkins regarding his claim that he was discriminated against in pay. Drivers are entitled to full-scale pay once they have been employed by Groot for 42 months. Hawkins was entitled to full-scale pay beginning on January 5, 1998, but Groot failed to raise his salary to full-scale until

---

[26]For example, when Woodfork called in sick for March 1, 1999 and left a message on the voice mail rather than speaking with a supervisor, he did not receive a warning letter. Woodfork claims he could not speak with a supervisor because he called on a Sunday when no supervisors were available, and thus committed no infraction. The conclusion that he committed no infraction does not follow. Whether he agrees with the rationale for the rule or not, Woodfork could have complied with the rule by calling early Monday morning and speaking with a supervisor. And the fact that Woodfork committed the exact same violation two more times (and received written warnings) suggests that Woodfork could have avoided some of the written warnings by reading the work rules.

October 5, 1998. Upon discovering that he had not been properly paid for ten months, Hawkins did not file a grievance (though he could, and should, have), but he raised the issue with Dowling and Phillips on several occasions beginning in October 1998. It is disputed whether he complained, or simply made inquiries. It is also disputed whether he voiced any concern that the discrepancy in his wages was the result of race discrimination. After his termination on May 5, 1999, Hawkins filed an EEOC complaint, which included an allegation that he was discriminated in pay. After Hawkins filed his EEOC complaint, but before this litigation commenced, Groot paid him the full amount he was due for the ten months he was paid at the wrong rate.

There is no question that Hawkins can make a prima facie case of pay discrimination: it is undisputed that other similarly situated white drivers were paid full-scale as soon as they became entitled to it. But Groot argues that it has a legitimate, non-discriminatory reason: clerical error. Hawkins transferred to Groot from its subsidiary Crown Recycling & Waste Services, Inc. ("Crown"). According to Groot, it miscalculated the combined amount of time Hawkins worked for both Groot and Crown, and thus mistakenly failed to raise Hawkins to full-scale when he first became entitled to that rate. Groot claims it reexamined its files after Hawkins filed his EEOC complaint, discovered the error, and promptly paid him what he was owed. In support of its non-discriminatory reason, Groot points out to the undisputed fact that in 1997, 1998 and 1999, Groot paid other black drivers full-scale as soon as they became entitled to that rate.

Given Groot's proffered non-discriminatory reason for the pay discrepancy, the burden is on Hawkins to show that Groot's reason is pretextual. Hawkins fails to raise a disputed issue of material fact on the matter of pretext. Apart from his own personal belief, Hawkins offers no basis to support a finding that Groot's failure to pay him full-scale as soon as he became entitled was the result of racial discrimination. "Such subjective beliefs of the plaintiff, however, are insufficient to create a genuine issue of material fact." *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989). Groot's motion for summary judgment regarding Hawkins' claim for pay discrimination is granted because no reasonable jury could find in Hawkins' favor on this claim.

## IV.    Retaliatory Discharge

Groot seeks summary judgment against Hawkins and Woodfork on their retaliatory discharge claims as well. In *Haywood v. Lucent Technologies, Inc.*, __ F.3d __, 2003 WL 1400496 (7th Cir. Mar. 20, 2003), the Seventh Circuit reviewed the ways in which a prima facie case of retaliation can be established:

> The plaintiff may establish a *prima facie* case of retaliation in one of two ways. First, [he] may present direct evidence of a statutorily protected activity, an adverse action and a causal connection between the two.
> . . .
> The second is the indirect method, our "adaptation of *McDonnell Douglas* to the retaliation context." At the first stage, the plaintiff must show that (1) [he] engaged in statutorily protected activity; (2) [he] performed [his] job according to [his] employer's legitimate expectations; (3) despite [his] satisfactory job performance, [he] suffered an adverse employment action; and (4) [he] was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. Under this method, the "plaintiff so proceeding need not show even an attenuated causal link."

25

*Id.* at *5 (internal citations omitted).

Regarding Hawkins, Groot contends that his claim fails because he did not engage in protected activity, he cannot establish that he was performing satisfactorily, and there is no evidence that Groot's reason for terminating Hawkins—his disciplinary record—was pretextual. Hawkins' one-paragraph argument in opposition to summary judgment on this claim is woefully deficient. It is clear, however, that Hawkins claims he engaged in protected activity in two ways: through his association with Frederick Giles, a black co-worker who filed an EEOC complaint, and through his own internal complaints about the discrepancy in his pay.[27] His affiliation with Giles is insufficient as a matter of law: being friends with a person who files an EEOC complaint does not constitute protected activity. *See Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 886 (7th Cir. 1998) (providing spiritual guidance and friendship does not constitute engaging in protected activity). There is a genuine issue of material fact regarding whether his complaints about the discrepancy in his wages constitute protected activity, however. Hawkins claims that he addressed the pay discrepancy with Dowling and Mayer on more than one occasion beginning in October 1998. If he merely raised a problem with his salary, he did not engage in protected activity. The disputed issue is whether he ever indicated to them that he believed the discrepancy was the result of

---

[27]This is a new theory for Hawkins; his original complaint was based merely on his association with Giles.

racial discrimination. Given this disputed issue, the court must assume for purposes of this motion that Hawkins did engage in protected activity.

But even assuming that Hawkins engaged in protected activity, his claim cannot survive. He cannot proceed under the *McDonnell-Douglas* test because he cannot show he was performing up to Groot's reasonable expectations. Granted, as explained above, Hawkins did not have to make a showing on that element for his discriminatory discharge claim because that claim was based on discriminatory enforcement of discipline policies. But the court finds no legal basis to eliminate that element from the *McDonnell-Douglas* test with respect to the retaliatory discharge claim, an entirely independent basis for recovery. If that element were eliminated, Hawkins' retaliatory discharge claim would be identical to his discriminatory discharge claim, with no required showing of causation between engaging in protected activity and discharge. Such a result is illogical.

At a minimum, therefore, Hawkins must raise a material issue of fact regarding a causal connection between engaging in protected activity and discharge—and he has failed to do so. Hawkins argues (without any citation to the record or the statement of facts) that as a result of his complaints about the disparity in pay, he "was made to work more and later than others . . . [and] was then subjected to inferior terms and conditions of employment and ultimately terminated." (Hawkins' Opp. Br. at 18.) As to the assertion that he had to work more and later than others, Hawkins identified a single instance in which Dowling allegedly allowed other drivers to go home rather

than sending them to help Hawkins (who usually worked alone) finish his route when he had an injured leg. (Hawkins Dep. 296:4-17.) That incident took place sometime after March 29, 1999. Hawkins offers no connection between that incident and his complaints about the pay disparity. Indeed, Hawkins' testimony suggested that the incident occurred in retaliation for his association with Giles, not for any complaints about pay. And his assertion that he was subjected to inferior terms and conditions of employment after complaining about his pay is unsupported. Without some evidence that Hawkins' allegedly awful situation at work became even worse after he engaged in protected activity — which Hawkins has not offered — a reasonable jury could not render a verdict for him for retaliatory discharge.

Nor does Woodfork's retaliatory discharge claim survive summary judgment. Like Hawkins, he cannot rely on the *McDonnell-Douglas* test because he cannot show that he was meeting Groot's reasonable performance expectations; he must instead show some causal connection between engaging in protected activity and getting fired. It is uncontested that Woodfork engaged in protected activity. On August 11, 1999, after punching in two minutes late and getting sent home from work, Woodfork filed a grievance claiming that the disciplinary policy was enforced more harshly against black employees than white employees. On August 31st, Woodfork submitted another written grievance, complaining that Bob Lewkowicz had been racially harassing him.[28]

---

[28]Groot's investigation of this complaint resulted in Lewkowicz admitting to the allegations and "voluntarily resigning."

On November 5th, Woodfork filed an EEOC charge. And on November 30, 1999, Woodfork filed a grievance contesting an attendance-related warning letter. A few weeks later, on December 21, 1999, Woodfork was terminated.

The problem for Woodfork is that Groot offers Woodfork's accumulation of excessive attendance-related warning letters as "unrebutted evidence that it would have taken the adverse employment action against [Woodfork] anyway, 'in which event [Groot's] retaliatory motive, even if unchallenged, was not a but-for cause of the plaintiff's harm.'"[29] *Haywood*, 2003 WL 1400496, at *5 (quoting *Stone v. City of Indianapolis Public Util. Div.*, 281 F.3d 640, 642 (7th Cir. 2002)). Groot's motion for summary judgment on this claim is therefore granted.

## Conclusion

For the reasons given above, Groot's motion for summary judgment against Hawkins is granted in part and denied in part, as is its motion for summary judgment against Woodfork.

ENTERED:

JOAN B. GOTTSCHALL
United States District Judge

Dated:        March 31, 2003

---

[29]Woodfork could attempt to rebut Groot's explanation for his discharge if his discriminatory discharge claim were still viable, but it is not.