# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 1731 | **DATE** | 9/2/2003 |
| **CASE TITLE** | Hawkins, et al. vs. Groot Industries, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
       ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION & ORDER. Defendants' motion for summary judgment against plaintiff Enrique Hernandez [58-1] is granted, as is defendants' motion for summary judgment against plaintiff Javier Guerrero [55-1].

(11) ■ [For further detail see order attached to the original minute order.]

Document Number: 134

DOCKETED
SEP - 5 2003

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ANDERSON HAWKINS, LAWRENCE )
WOODFORK, ENRIQUE HERNANDEZ, )
and JAVIER GUERRERO, on behalf of )
themselves and all others similarly situated, )
                                                       ) Case No. 01 C 1731
                Plaintiffs, )
)
v. )
)
GROOT INDUSTRIES, INC. and GROOT ) Judge Joan B. Gottschall
RECYCLING AND WASTE SERVICES, ) Magistrate Martin C. Ashman
INC., )
)
                Defendants. )

## MEMORANDUM ORDER & OPINION

Plaintiffs Enrique Hernandez and Javier Guerrero have sued their former employer(s), Groot Industries, Inc. and Groot Recycling and Waste Services, Inc. (collectively "Groot"), for various violations of 42 U.S.C. § 1981. Hernandez and Guerrero bring individual claims alleging that they were subjected to a hostile work environment, discriminatory discharge,[1] and unequal terms and conditions of employment relating to promotions, work assignments, and compensation at Groot because they are Hispanic. In separate motions, Groot moved for summary judgment against both Guerrero and Hernandez. For the reasons explained below, Groot's motions for summary judgment against Hernandez and Guerrero are granted.

## Analysis

Summary judgment is proper only if "the pleadings, depositions, answers to

---

[1] It is disputed whether Hernandez or Guerrero actually brought a claim for discriminatory discharge in either the first or second amended complaints. For present purposes, the court assumes they did raise discriminatory discharge claims.

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether the movant is entitled to summary judgment, the court examines the admissible evidence in the light most favorable to the nonmoving party, drawing any reasonable inferences in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). To avoid summary judgment, the party bearing the burden of proof on an issue must affirmatively show the existence of a genuine issue of material fact that requires trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). But "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. *Anderson*, 477 U.S. at 248. Courts apply the summary judgment standard "with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Courtney v. Biosound, Inc.*, 42 F.3d 414, 418 (7th Cir. 1994) (internal quotation marks and citations omitted).

With this standard in mind, the court examines Groot's motions for summary judgment against Hernandez and Guerrero.

I. **Discriminatory Discharge Claims**

Groot seeks summary judgment against both Guerrero and Hernandez on their claims for discriminatory discharge. A plaintiff can establish a prima facie case of discriminatory discharge in one of two ways: by offering direct evidence of discrimination or by utilizing the burden-shifting method set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cowan v. Glenbrook Sec. Servs.*, 123 F.3d 438, 442 (7th Cir. 1997). Both Hernandez and Guerrero are proceeding under the *McDonnell Douglas* method. Ordinarily, to

2

survive summary judgment on a discriminatory discharge claim using the *McDonnell Douglas* method, a plaintiff must show that (1) he belongs to a protected class; (2) he performed his job in accordance with his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees outside the protected class received more favorable treatment. *Curry v. Menard, Inc.*, 270 F.3d 473, 477 (7th Cir. 2001). "Establishing a prima facie case creates a presumption of discrimination and shifts the burden to the employer to produce evidence of a legitimate, race-neutral reason for the adverse action." *Id.* If that burden of production is met, "the plaintiff then has the burden to show that the stated nondiscriminatory reason is pretextual." *Id.*

Neither the first nor the third elements are in dispute for Hernandez or Guerrero. As for the second element, both plaintiffs argue that they were singled out for discipline, and ultimately terminated, because of their ethnicity. Accordingly, "it makes little sense . . . to discuss whether [plaintiffs were] meeting [their] employer's reasonable expectations." *Id.* (internal quotation marks and citation omitted). The threshold inquiry, therefore, is whether either Guerrero or Hernandez has shown that similarly situated Groot employees who are not members of his protected class received more favorable treatment than he did under Groot's discipline policy. Both Hernandez and Guerrero allege that Groot enforced the work rules more harshly against Hispanics than against its white employees.

The following work rules are relevant to plaintiffs' discriminatory discharge claims. Groot's safety work rules state that drivers will receive a warning notice if they are involved in an avoidable accident causing under $500 worth of damage, a three-day suspension without pay if they are involved in an avoidable accident involving more than $500 worth of damage, and a

3

five-day suspension without pay if the damage exceeds $1000. Additionally, for all rear-end accidents, regardless of the amount of damages, drivers are supposed to receive a five-day suspension under the safety work rules. If an avoidable accident involves injuries, drivers may receive a five-day suspension, or may be terminated.

The collective bargaining agreement between Groot and the drivers' union, known as the Private Scavengers Agreement, provides that a driver can be terminated only for just cause and that Groot will use progressive discipline where possible. Nevertheless, the Private Scavengers Agreement specifically provides that "no notice need to be given to [a driver] before he is discharged for just cause for . . . failure to report an accident to [Groot] . . . ." (Defs.' L.R. 56.1(a) statement re: Hernandez and Pl.'s. resp. at ¶ 83.) Likewise, under the Private Scavengers Agreement, Groot has authority to terminate drivers for dishonesty rather than subjecting them to progressive discipline. (Defs.' L.R. 56.1(a) statement re: Guerrero and Pl.'s. resp. at ¶ 68.) Thus, "Rule 17 of Groot's work rules states that Groot will terminate drivers for dishonesty including '[p]roviding unauthorized services . . . [or] serving unauthorized accounts.'" (*Id.* at ¶ 69.) Under Rule 17, it makes no difference whether or not the driver accepts payment to provide unauthorized services.

### A. Hernandez's Discriminatory Discharge Claim

Regarding Hernandez's discriminatory discharge claim, he has not made the requisite showing that similarly situated non-Hispanics received more favorable treatment than he did. "[A]n employee need not show complete identity in comparing himself to the better treated employee, but he must show substantial similarity." *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir. 2000). In disciplinary cases like this one, "a plaintiff must show that he is

4

similarly situated with respect to performance, qualifications, and conduct. This normally entails a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without differentiating or mitigating circumstances as would distinguish their conduct or their employer's treatment of them." *Id.* at 617 (internal citations omitted). Hernandez was terminated on January 5, 2000, after Groot concluded that Hernandez had failed to report an accident. Of the numerous white employees Hernandez claims were similarly situated, only two were disciplined for failure to report an accident: Dan Blanks and Terry Marchand. The other white drivers he offers as examples were disciplined, but not terminated, after being involved in an avoidable accident. Unlike failing to report an accident, involvement in an avoidable accident is not grounds for immediate termination (unless there were injuries). Blanks and Marchand are therefore the only two potentially similarly-situated drivers.

According to Groot's records, Blanks received a warning notice issued by supervisor Jim Dowling dated January 3, 1996 for an incident that occurred on December 28, 1995. The warning states that Blanks damaged a truck "by hitting a low bridge and did not report the damage. It is Company policy to report any damage no matter how minor." Blanks was not terminated for that incident. He received several other warning notices for infractions of the work rules during the following six years, but none for failing to report an accident. At Dowling's deposition when he was asked why Blanks was not terminated, he testified that a small hydraulic hose was torn when Blanks drove under a low bridge, and the damage was too minor for Blanks to have noticed.

As for Marchand, he received a warning notice from Dowling dated September 1, 1999

5

for failing to report damage to the bumper of the truck he drove on August 30, 1999. According to the write-up, the driver assigned to drive the truck on September 1st found some damage to the bumper during his pre-trip inspection. Marchand was the last driver to drive that particular truck, and had not reported any damage in his post-trip paperwork. The warning notice stated "Please report any damages to any truck and note on your pre trip and post trip paper work which you are required to do so [sic] by DOT Regulation and Company Policy." Marchand was not terminated for the incident. Although Marchand's file contains several other warning notices, there are no others for failure to report damage.

Hernandez, as indicated above, was terminated on January 5, 2000 after Groot determined that he had failed to report an accident. On January 4, 2000, supervisor Randy Radatz had received a report from the Village of Morton Grove that a Groot driver had damaged landscaping at a customer's home in Morton Grove. The homeowners had provided a description of the truck and the driver, which was conveyed to Radatz. Radatz reported that he went to the property shortly after receiving the complaint where "he saw distinctive tire tracks that he recognized as belonging to a Groot vehicle and that showed a Groot vehicle had damaged bushes." (Defs.' L.R. 56.1(a) statement re: Hernandez and Pl.'s. resp. at ¶ 131.) According to Radatz, the description matched Hernandez's description and truck number. Moreover, the home where the damage occurred was on Hernandez's recycling route on the day the homeowners reported the damage. Further, Groot collected only recycling in Morton Grove, not garbage, and thus had not sent a garbage truck to the address where the accident occurred.[2] When Radatz asked Hernandez

---

[2]This fact is undisputed, even though Hernandez testified at his deposition that a Groot garbage truck also worked the route.

6

about the damage, he denied (and continues to deny) that he was involved in the incident. Despite his denial, Radatz concluded, based on the information he had, that Hernandez caused the damage. Radatz communicated his conclusion to Craig Phillips and Jim Dowling, who determined that termination was warranted because they believed Hernandez had failed to report property damage for which he was responsible. Phillips and Dowling found it embarrassing that the company had to learn of the damage from the Village rather than the driver. Additionally, Phillips "believed that Hernandez had a pattern of disclaiming responsibility for accidents . . . ."[3] (*Id.* at 144.)

Prior to his termination, Hernandez had received several warning notices for various infractions of the rules, including one warning notice for failure to report an accident. On July 22, 1999, Hernandez backed into a metal sign while reversing to dump a load from his truck. A supervisor at the dumping site, Bob Cordell, saw the accident. After Cordell and Hernandez discussed the accident,[4] Cordell reported the accident to the Groot office. Thus, by the time Hernandez returned to the Groot facility, Dowling had already learned of the accident from Cordell. Hernandez received a warning notice and a one-day suspension for the accident, in part

---

[3]This belief was evidently based on Hernandez's accident record. In May 1998, Hernandez had a rear-end accident, which he claimed was caused by brake failure. Groot investigated, believed him, and withdrew the discipline. In December 1998, Hernandez had a second rear-end accident. Although he again claimed that the brakes failed, he received a warning notice, a five-day suspension, and driver education after Groot concluded there was no problem with the brakes. In July 1999, Hernandez backed into a sign; he explained that the rearview video camera was not working (a problem he had reported several times), but he admitted the truck also had rearview mirrors. The final incident in Morton Grove was the accident that resulted in his termination.

[4]According to Hernandez, Cordell saw the accident, they discussed it, and Cordell said he was going to report it to his supervisor. According to Groot, Cordell reported that Hernandez was driving away from the accident without acknowledging it when Cordell stopped him.

7

because Groot determined that he had failed to use his rearview mirrors properly and in part because he had not reported the accident. Hernandez did not file a written grievance with his union challenging this warning notice.

Of Blanks, Marchand and Hernandez, only Hernandez had two instances where Groot determined that he had failed to report an accident.[5] For that reason alone, Hernandez has failed to show that either Blanks or Marchand received more favorable treatment. Whether or not Hernandez deserved a written warning for failure to report regarding the July 1999 incident is not for the court to determine. *See Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 984 (7th Cir. 1999) (not court's role to "sit as a superpersonnel department that reexamines an entity's business decisions"). If Hernandez wanted to challenge that warning notice, he could have filed a grievance with his union. The fact is, Groot determined that he failed to report an accident, but opted to issue a warning notice rather than terminate him, just as it did with Blanks and Marchand. It was only after Groot concluded that Hernandez had failed to report a second accident that Groot terminated his employment. Hernandez has failed to set forth a prima facie case of discriminatory discharge, thus warranting summary judgment on that claim.

### B. Guerrero's Discriminatory Discharge Claim

Nor can Guerrero's discriminatory discharge claim withstand summary judgment. Groot fired Guerrero for making an unauthorized pick up, specifically, for picking up construction debris from a customer when he was supposed to pick up only yard waste in that municipality. "Rule 17 of Groot's work rules states that Groot will terminate drivers for dishonesty including

---

[5]Regarding Marchand, although the court assumes for present purposes, that he caused the damage, the warning notice states only that he failed to report it, not that he necessarily caused it.

'[p]roviding unauthorized services . . . [or] serving unauthorized accounts.'" (Defs.' L.R. 56.1(a) statement re: Guerrero and Pl.'s resp. at ¶ 69.) Guerrero admits that he picked up construction debris, and further admits that he violated Groot's work rules, but he believes that he deserved a second chance. In other words, he believes his termination was unfair. Although he points to Joe Esposito as a potentially similarly situated white driver who received such a second chance, the record shows at least three other white drivers, Chris Lewkowitz, Dan Hoffman, and James Dayhoff, who were terminated without progressive discipline the first time Groot discovered them making an unauthorized pick up. Under these circumstances, Guerrero is not entitled to a rebuttable presumption of discrimination under *McDonnell Douglas*. Moreover, Guerrero expressly testified at his deposition that he does not believe his termination was the result of racial discrimination.[6] Given these facts, no reasonable jury could find that Groot terminated Guerrero because of his race. The court thus grants summary judgment in favor of Groot on Guerrero's discriminatory discharge claim.

## III. Unequal Terms and Conditions of Employment

Hernandez and Guerrero also claim that they were discriminated against in the terms and conditions of their employment. Specifically, they claim that Hispanics, themselves included, were denied promotions, denied light duty, received unequal pay, and were given inferior routes and trucks. Perhaps other Hispanic employees at Groot have viable claims for such unequal

---

[6]In a last ditch effort to avoid summary judgment on this claim, Guerrero argues that when he testified that he believes his termination was unfair, he meant that he was discriminated against—despite his unequivocal deposition testimony that his termination was not the result of his race. This argument is disingenuous, particularly because Guerrero presented no evidence whatsoever that he was confused during his deposition, or otherwise misunderstood what he was being asked.

9

terms and conditions of employment, but neither Hernandez nor Guerrero do.

Their claims that they were denied promotions fail because neither Guerrero nor Hernandez ever applied for a promotion—which is an essential element of a failure-to-promote claim. *Bragg v. Navistar Int'l Transp. Corp.*, 164 F.3d 373, 377 (7th Cir. 1998). Plaintiffs argue that promotion opportunities were not posted, published or communicated to Hispanics, and thus their failure to apply for a promotion should not be fatal to their claim. The court disagrees. It is undisputed that under the terms of the Private Scavengers Agreement, Groot must post a bid sheet for five working days when a permanent opening becomes available in a bargaining unit job classification, and that bargaining unit employees with at least 12 months seniority can bid on the job. Plaintiffs set forth no evidence that Groot failed to adhere to those requirements, or otherwise concealed promotion opportunities from them, thus leaving their argument wholly unsupported.[7]

Similarly, plaintiffs' claims that they were denied light duty lack merit. Neither Hernandez nor Guerrero ever requested light duty. As for the claims that they received unequal pay, there is no evidence in the record that either Hernandez or Guerrero was paid less that they were supposed to be paid under the Private Scavengers Agreement,[8] let alone evidence that any similarly situated white drivers were paid more than plaintiffs.

---

[7]It is worth noting that with few exceptions, plaintiffs' briefs in opposition to summary judgment contain no citations to the record in support of their arguments. Although the court reviewed the materials submitted, the court has no duty to "scour the record" in search of facts that might support a party's claim—it is the party's duty to bring such facts to the court's attention. *See L.S. Heath & Son, Inc. v. AT&T Info. Sys., Inc.*, 9 F.3d 561, 567 (7th Cir. 1993).

[8]In fact, contradicting their own claims, plaintiffs admit that Guerrero was paid $12.50 per hour when Groot could have paid him just $10.00 per hour under the Private Scavengers Agreement.

Hernandez and Guerrero's claims that Groot assigned them to inferior routes and trucks also fail. Guerrero offers no evidence of any similarly situated white driver who received a better route or truck. What is more, Guerrero's own deposition testimony contradicts his claim. Regarding route assignments, he testified that all drivers, whether white or Hispanic, were assigned some difficult routes and some easy routes. Likewise, when asked whether he felt that all recycling drivers were treated the same, he answered "I feel that [Groot] treated us all equally." (Defs.' L.R. 56.1(a) statement re: Guerrero and Pl.'s resp. at ¶ 105.) When explicitly asked "Do you feel during your entire employment with Groot, . . . that you were treated equally with other drivers for the trucks that you drove?" he responded "Yes. They would treat us equally." (*Id.* at ¶ 107.) In opposing summary judgment, Guerrero does not deny that he gave such testimony at his deposition. Instead, he argues that "in his affidavit he explicitly states that Hispanics were not assigned to the better trucks." (Pl.'s Br. Opp. Mot. Summ. J. at 18.) But there is no affidavit on file that says any such thing. No affidavit was included in the materials Guerrero submitted in opposition to summary judgment. Although the court located one affidavit, prepared at the start of his case (dated June 21, 2001, submitted in support of plaintiffs' motion to file the first amended complaint), that affidavit says nothing whatsoever about route and truck assignments. Moreover, even if that affidavit had addressed route and truck assignments, it is highly unlikely that it could defeat summary judgment. As the Seventh Circuit has held, "Affidavits, though signed under oath by the affiant, are typically . . . written by the affiant's lawyer, and when offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy." *Beckel v. Wal-Mart Assoc., Inc.*, 301 F.3d

11

621, 623 (7th Cir. 2002). "The explanation, moreover, must come in the affidavit itself...." *Id.* Guerrero has failed to establish a prima facie case that he was given inferior route and truck assignments because of his race.

Hernandez's claim fares no better. According to Hernandez's deposition testimony, a good route had few if any alleys, while a bad route had a lot of alleys; alleys complicate the job because they are narrow, requiring drivers to manuever the truck more. Hernandez was assigned to routes with alleys three days a week, and street routes two days a week. But like Guerrero, he offers no evidence of any similarly situated white driver who received better route or truck assignments. The only evidence offered is that Groot replaced one of his "more or less good routes" in order to assign him to an alley route that had previously been assigned to a white driver. This alone does not establish a prima facie case of discrimination, but even if it did, Hernandez himself offers a legitimate, non-discriminatory reason for the reassignment. Hernandez testified that he substituted for the white driver, and when Groot saw that he could complete the route more quickly than the other driver, Groot assigned Hernandez to the route permanently. Hernandez thus concedes that Groot had a legitimate business reason for its decision. There is no issue of pretext here. Hernandez's claim therefore cannot survive summary judgment.

### III. Hostile Work Environment Claims

Groot also moves for summary judgment on Guerrero and Hernandez's claims that they were subjected to a racially hostile work environment. To succeed on a hostile work environment claim, a plaintiff "must show that (1) he was subjected to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment was severe and pervasive so as to

12

alter the conditions of the employee's environment and create a hostile or abusive working environment; and (4) there is a basis for employer liability." *Mason v. S. Ill. Univ.*, 233 F.3d 1036, 1043 (7th Cir. 2000). Groot argues that neither Hernandez nor Guerrero were exposed to actionable harassment and that even if they were, Groot is not legally responsible for such harassment. Because the court agrees that neither plaintiff has an actionable harassment claim, it need not address whether there is a basis for employer liability.

Both plaintiffs testified during their depositions regarding racial slurs they heard at Groot. Hernandez testified regarding two incidents in which he heard racial slurs, both of which occurred during arguments among Groot drivers while working away from Groot's main facility. In one incident, on a Friday in Niles, white, Hispanic and black drivers got into an argument, allegedly while supervisor Randy Radatz was present. Hernandez heard the words "nugger" [sic] and "monkey" used against blacks. He also heard the word "spic," which he did not understand at the time. (Hernandez's primary language is Spanish; his English is limited.) He testified that he learned later only that it is a bad word, not that it is a racially derogatory word relating to Hispanic people. In the second incident, on a Thursday in Niles, he heard the slur "wetback." The following day, he asked a coworker what the word meant, and learned it was a derogatory term regarding Hispanics. Although Hernandez heard the slurs, none of them were directed at him. In further support of his claim, Hernandez offers testimony from other Hispanic and black Groot drivers regarding slurs they heard at Groot, though nothing in the record suggests that Hernandez knew about those incidents while he worked at Groot.

Groot argues that because Hernandez did not understand the words "spic" or "wetback" when he heard them, those words cannot support his hostile work environment claim. The court

13

disagrees, at least regarding the term "wetback." It is true that a comment cannot be harassing unless the plaintiff perceives the comment to be discriminatory. *See, e.g., Huff v. Sheahan*, No. 97 C 4568, 2001 U.S. Dist. LEXIS 14656, at *24 (N.D. Ill. Sept. 19, 2001) (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). But Hernandez learned the very next day that "wetback" was a racially derogatory term for Hispanics, thus affecting his perception of the prior day's incident, and his work environment. The fact that he did not know the slur's meaning at the precise moment he heard it makes no difference (although it would likely make a difference if he learned the meaning only after his employment ended, because his perception of the work environment at the time of his employment is what matters). In contrast, the fact that Hernandez heard the word "spic" used cannot support his hostile work environment claim because, to this day, he does not perceive the word to be a racial slur.

Nevertheless, the evidence before the court is insufficient to support a claim that Hernandez was subjected to a hostile work environment. A plaintiff "must produce admissible evidence that he *personally* was subjected to discrimination." *Hawkins v. Groot Indus. Inc.*, No. 01 C 1731, 2003 WL 1720069, at *3 (N.D. Ill. Mar. 31, 2003) (emphasis added). Here, Hernandez offers evidence only of comments directed at other employees. As recognized by the Seventh Circuit, "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Fin. Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997) (internal citation omitted). Further, he heard racial slurs used on only two occasions: one incident in which he heard a word that he perceived to be a slur against Hispanics,[9] and a

---

[9]Hernandez argues that, in addition to the specific incidents he described, he testified that "wetback" was a word used frequently at Groot, and that his inability to give more specifics about each instance is not fatal. Under other circumstances, the court might agree. *See Hawkins*,

14

second incident in which he heard slurs directed at blacks. These isolated incidents of racial slurs directed at others are simply not enough for a reasonable jury to conclude that Hernandez experienced racial harassment severe and pervasive enough to constitute a hostile work environment. Had Hernandez himself been the target of any of the racial slurs, the result might be different because in evaluating his hostile work environment claim, the court considers "'the totality of circumstances, including evidence of harassment directed at employees other than plaintiff.'" *Hawkins*, 2003 WL 1720069 at *3. But that is not the case here. While others' experiences can buttress a plaintiff's claim, they cannot form the entire basis of the plaintiff's claim, at least under the circumstances presented here.[10]

Guerrero's hostile work environment claim fails for the same reasons: none of the derogatory comments about Hispanics were directed at him, and he heard them on only three isolated occasions. In July 1998, he overheard a group of white drivers, including Chris Lewkowicz, making comments about "stupid" Mexicans taking away their jobs. On another occasion in July 1998, Guerrero overheard Lewkowicz and three other white drivers again making comments about "Dumb Latinos" and "Dummy Latinos" taking away their work. Then

---

2003 WL 1720069 at *2 (where hostile work environment claim involves ongoing conduct, plaintiff "'need not date stamp every incident'"). But Hernandez's testimony about the other times he heard the word suggests it was used in a joking context, not a hostile one—or at least that that was how Hernandez perceived its usage. When Hernandez testified that "wetback" was used frequently at Groot, (Hernandez Dep. 65:20-66:1), he further explained that employees at Groot "always joke with each other excessively; and if one starts joking around, sometimes one has to take what one gets." (*Id.* 66:3-7.) As an example of the excessive joking, he explained, "they would call me skinny guy. I know I'm thin, but I'm healthy." (*Id.* 66:7-8.)

[10]Nor does Hernandez's affidavit, prepared at the start of his case, save his claim. As explained earlier, affidavits that contradict deposition testimony are entitled to no weight on summary judgment "unless the affiant gives a plausible explanation for the discrepancy," which Hernandez has not done. *Beckel*, 301 F.3d at 623.

15

in September 1998, he heard Lewkowicz say "Hello Taco Bell" to Hispanic driver Fausto Arceo.[11] Like Hernandez, there is simply insufficient evidence to support a hostile work environment claim by Guerrero.

**Conclusion**

For the reasons explained above, the court grants Groot's motion for summary judgment against Hernandez and Guerrero on all claims.

ENTERED:

JOAN B. GOTTSCHALL
United States District Judge

Dated: September 2, 2003

---

[11]Guerrero also heard Lewkowicz call another Hispanic driver "monster," apparently repeatedly. This does not help his claim because it has not been shown that there is anything racial about calling someone "monster."

16